#24707-a-DG

**2009 SD 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MONNY TRUMAN, individually and as
special administrator of the Estate of
Patricia Truman, Deceased, STEVEN
ROUNDS and DEE ANN ROUNDS,
husband and wife, individually and as
conservators for CIARA ROUNDS and
ZACHARY ROUNDS, minors, and
as the natural parents of JESSE
GERARD ROUNDS, deceased
unborn child,                                                                    Plaintiffs and Appellants,

   v.

DARREN GRIESE, South Dakota
Department of Transportation
Pierre Region Traffic Engineer,
and JOHN DOES, employees of the
South Dakota Department of
Transportation,                                                                 Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE LORI S. WILBUR
Judge

\* \* \* \*

ARGUED APRIL 23, 2008
REASSIGNED DECEMBER 9, 2008
OPINION FILED **02/11/09**

RONALD A. PARSONS, JR.
A. RUSSELL JANKLOW
TAMARA A. WILKA of
Johnson, Heidepriem, Janklow,
  Abdallah & Johnson, LLP
Sioux Falls, South Dakota                    Attorneys for plaintiffs
                                             and appellants.


JEFFREY R. CONNOLLY
J. CRISMAN PALMER of
Gunderson, Palmer, Goodsell
  & Nelson, LLP
Rapid City, South Dakota                     Attorneys for defendants
                                             and appellees.

#24707

GILBERTSON, Chief Justice (on reassignment).

[¶1.]    Monny Truman (Truman), individually and as special administrator of his wife Patricia's estate, and Steven and Dee Ann Rounds[1] sued Darren Griese (Griese), in his official capacity as South Dakota Department of Transportation (DOT) Pierre Region Traffic Engineer, and employees of the DOT as John Does after a car accident forty miles west of Pierre.  Griese moved for summary judgment based on sovereign immunity.  The trial court granted Griese's motion.  Truman appeals.[2]  We affirm.

## FACTS

[¶2.]    The accident occurred at the intersection of three highways:  South Dakota Highway 34, South Dakota Highway 63, and United States Highway 14. This intersection is also known as "Four Corners."  The traffic design of this interchange is not easily conveyed in words.  S.D. Highways 63 and 34 meet at a "T" intersection.  S.D. 34 forms the top of the "T," running east-west.  S.D. 63 forms the bottom of the "T," north-south, but continues west along the top-*left* part of the "T," merging at a right angle with S.D. 34.

[¶3.]    U.S. 14 travels across top-*right* part of the "T," east-west with S.D. 34, then continues north-south with S.D. 63.  However, U.S. 14 does not continue to a

---

1.    Steven and Dee Ann sued individually; as conservators for their children, Ciara and Zachary; and as the natural parents of their deceased unborn child, Jesse.  The Trumans are Dee Ann's parents.

2.    The plaintiffs/appellants will be referred to as Truman unless further distinction is necessary.  Likewise, the defendants/appellees will be referred to as Griese.

-1-

stop at the right angle intersection of the "T." Instead, U.S. 14 curves between the two roads, just southeast of the "T." This curved route creates two "Y" intersections at the junctions of U.S. 14 and S.D. 63 (south of the "T" intersection), and U.S. 14 and S.D. 34 (east of the "T" intersection). As a result of this design, the through-traffic on U.S. 14 does not stop to make the direction change. *See* Attachment 1.

[¶4.] On February 13, 2004, Monny and Patricia Truman, Dee Ann Rounds, twelve-year-old Ciara Rounds, and eight-year-old Zachary Rounds were driving in Truman's vehicle from Pierre to Rapid City. They traveled west-bound on U.S. 14/S.D. 34. Truman approached Four Corners and followed U.S. 14 along the south-bound curve.

[¶5.] At the same time, Richard Giago was driving north on S.D. 63/U.S. 14 (The bottom of the "T"). Giago's wife, Sue Ann, and son, Jayden, were passengers in his vehicle. When Giago reached the point where S.D. 63/U.S. 14 diverge, he continued northward on S.D. 63, across the "Y" junction.[3]

[¶6.] The vehicles collided almost head on. The results were devastating. Truman suffered broken bones, a skull injury, and permanent vision loss in his right eye; Patricia was killed; Dee Ann suffered severe head injuries and multiple broken bones; Dee Ann and Steven lost their unborn child, Jesse; Ciara and Zachary suffered minor injuries; Giago and Jayden both suffered severe injuries and were hospitalized; Sue Ann was killed.

---

3. Signs warned of the oncoming curve from both directions, and a double yellow line crossed the junction down the center of U.S. 14, across S.D. 63's north-bound path.

[¶7.] Truman brought claims against Griese for negligence, wrongful death and loss of consortium. Truman alleged Griese violated duties imposed by SDCL 31-28-6 by failing to post additional traffic control signs at Four Corners. Griese filed a motion for summary judgment on the basis of sovereign immunity. The trial court entered an order in favor of Griese's motion.

[¶8.] Truman appeals the following issue:

> Whether Truman's claims under SDCL 31-28-6, regarding the necessity for and placement of highway warning signs, are barred by sovereign immunity under the facts of this case.[4]

## STANDARD OF REVIEW

[¶9.] "Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment." Public Entity Pool for Liability v. Score, 2003 SD 17, ¶7 n3, 658 NW2d 64, 67 n3 (citing Alden v. Maine, 527 US 706, 715, 119 SCt 2240, 2247, 144 LEd2d 636 (1999)). "In the absence of constitutional or statutory authority, an action *cannot be maintained* against the State." *Id.* (citing generally Lick v. Dahl, 285 NW2d 594 (SD 1979); Darnall v. State, 79 SD 59, 108 NW2d 201 (1961); Griffis v. State, 68 SD 360, 2 NW2d 666 (1942); Mullen v. Dwight, 42 SD 171, 173 NW 645 (1919)) (emphasis added).

---

4. Truman presents the issue as an all-encompassing holding "regardless of the facts of any particular case." (Appellants' Brief, p. 2). Such an approach is outside the scope of appellate review of this case. Throughout our numerous cases dealing with governmental entities and potential liability for failure to maintain highways, the question was, and continues to be, whether a plaintiff has identified facts particular to his or her case that establish, as a matter of law, that the function allegedly omitted is a ministerial function.

[¶10.]     It is settled that whether sovereign immunity applies is a question of law. Bickner v. Raymond Township, 2008 SD 27, ¶10, 747 NW2d 668, 671 (citations omitted). "Whether sovereign immunity precludes a plaintiff from pursuing a claim is a question of law which is reviewed de novo." King v. Landguth, 2007 SD 2, ¶8, 726 NW2d 603, 607 (citing Wulf v. Senst, 2003 SD 105, ¶19, 669 NW2d 135, 142 (citing Bego v. Gordon, 407 NW2d 801 (SD 1987))). Additionally, the predicate question, whether the governmental duties under SDCL 31-28-6 are ministerial or discretionary, is a question of law for this Court. Bickner, 2008 SD 27, ¶10, 747 NW2d at 671 (citing Hansen v. SD Dept. of Transp., 1998 SD 109, ¶18, 584 NW2d 881, 885).

## ANALYSIS AND DECISION

[¶11.]     No one can look at the facts surrounding this litigation without a sense of sorrow. Lives were lost and lives were damaged. Yet our task is a narrow one-- to determine if the State of South Dakota's sovereign immunity applies. In order to make this determination, first, we identify Truman's claim as it relates to this action. Next, we address the distinction between ministerial and discretionary duties in recognizing sovereign immunity. Then, we apply our sovereign immunity analysis to SDCL 31-28-6. Finally, we address the inapplicability of Truman's evidence and arguments regarding "material facts" in the grant of summary judgment on the basis of sovereign immunity. Because we conclude that Griese's duties under SDCL 31-28-6 are discretionary, sovereign immunity applies and the trial court is affirmed.

## Truman's Claim

[¶12.]      It is useful to begin by restating the precise conduct that Truman alleges does not have the protection of sovereign immunity. Broadly, Truman asserts that the omission[5] of additional signs at Four Corners violated Griese's duty to install traffic control signs pursuant to SDCL 31-28-6. This alleged omission could have occurred during one of two time periods-- either in the initial engineering and design of the intersection, or when a duty to erect signs arose *after* the intersection was built.

[¶13.]      The State has not waived sovereign immunity or consented to suit for any omission of signs that occurred during the initial engineering and design of Four Corners.

> To the extent that any public entity, other than the state,
> participates in a risk sharing pool or purchases liability
> insurance and to the extent that coverage is afforded
> thereunder, the public entity shall be deemed to have waived
> the common law doctrine of sovereign immunity and shall be
> deemed to have consented to suit in the same manner that any
> other party may be sued.

---

5.    This Court has drawn a distinction between cases where existing signs are knocked over or damaged, which only takes the ministerial task of restoring or replacing, and cases where there was never a sign to begin with.

In *Fritz v. Howard Tp.*, 1997 SD 122, ¶20, 570 NW2d 240, 244, we concluded:
> Once a warning sign is erected, it becomes
> a physical and integral part of the highway. As
> an appurtenant part of the highway the county
> had a continuing duty to maintain and keep the
> sign in reasonable repair for the safety of public
> travel.
(quoting Kiel v. DeSmet Tp.*, 90 SD 492, 497, 242 NW2d 153, 155 (1976)).

SDCL 21-32A-1. Pursuant to SDCL 3-22-1, the engineering and design of roadways is specifically *excluded* from this State's public entity pool for liability (PEPL).[6] Therefore, the State *has not waived* common law sovereign immunity for any omission that occurred during this time period.

[¶14.] Instead, Truman's claim alleges that *changes* have occurred in the nature of the intersection *since* its construction, which requires the erection of new warning signs. Truman does not identify any *physical* changes that have occurred or that the road has fallen out of repair. Therefore, the only issue is whether the *legal* requirements, duties, or standards applied to this intersection have changed.

[¶15.] The PEPL Memorandum of Liability Coverage to Employees of the State of South Dakota, point 16, provides that the ministerial acts of a government actor are not excluded from coverage. Because these acts are not excluded from coverage, the PEPL fund provides coverage for damages that result from ministerial acts. Thus, Truman argues, sovereign immunity has been waived for these acts.

[¶16.] The issue of PEPL coverage is not the definitive issue regarding Griese's purported liability. Even if, as argued by Truman and the dissent, PEPL coverage is a statutory waiver of sovereign immunity in this case, such a waiver

---

6. This exclusion from PEPL coverage is also contained in PEPL Memorandum of Liability Coverage to the Employees of the State of South Dakota 13-15, point 10.

   Even if PEPL coverage existed, such coverage is not necessarily relevant to the issue of the waiver of sovereign immunity. This Court has unanimously and recently held that the purchase of liability insurance does not waive statutory governmental immunities. Unruh v. Davidson County, 2008 SD 9, 744 NW2d 839.

alone does not *create* a duty where none would otherwise exist. *See* Gulbranson v. Flandreau Tp. 458 NW2d 361, 363 (SD 1990); Zens v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 386 NW2d 475 (SD 1986). The waiver of immunity and consent to be sued "in the same manner that any other party may be sued" contained in SDCL 21-32A-1 does not itself impose duties on a public official with PEPL coverage. "The legislature's intent to impose new duties upon public entities is simply not expressed in SDCL 21-32A-1. In fact, the term "duty" is not used at all in this statute." *Gulbranson,* 458 NW2d at 363. "[T]he phrase 'in the same manner' refers to a mode of procedure and not to the basis upon which a public entity may be sued." *Id.* Therefore, for Truman's claims to survive summary judgment on the basis of sovereign immunity, Truman must prove that Griese owed Truman a *ministerial* duty as a matter of law.

[¶17.]    Truman claims that the Legislature has waived sovereign immunity for the omission of signs at Four Corners because, as he characterizes Griese's duties under SDCL 31-28-6, this omission is a ministerial duty.

### Sovereign Immunity: Ministerial and Discretionary Duties

[¶18.]    Shortly after the adoption of Article III, section 27 of our State Constitution, this Court first recognized that sovereign immunity applied to the construction and maintenance of highways. Bailey v. Lawrence County, 5 SD 393, 59 NW 219 (1894).

> [W]hile it is true that the legislature has imposed upon counties the duty of keeping in repair the bridges on the public highways, and provided the method for raising revenue by taxation requisite for such purpose, yet to hold that the counties are thereby made liable for injuries caused by defects in such

> bridges, in the absence of legislation making them so liable, would be a species of judicial legislation.

*Id.* at 221.

[¶19.]     Shortly thereafter, we concluded that sovereign immunity applied to discretionary governmental duties but not to ministerial ones. State v. Ruth, 9 SD 84, 68 NW 189 (1896). In *Ruth* we defined a ministerial duty as a narrow one. It is where a governmental employee "disregarded a plain provision of the law[.]" *Id.* at 191. All other duties that fell outside that definition were discretionary. We also noted that "[i]t is the nature of the particular duty, and not the character of the office, which determines whether or not a duty is ministerial." *Id.*

[¶20.]     We have recently stated:

> It is well-settled that suits against officers of the state in their official capacity, are in reality suits against the State itself. It is further settled that the State is generally immune from suit under Article III Section 27 of the South Dakota Constitution. With respect to individual capacity suits, state employees who are sued in an individual capacity are entitled to immunity dependent upon the function performed by the employee. State employees are generally immune from suit when they perform discretionary functions, but not when they perform ministerial functions.

Sisney v. Reisch, 2008 SD 72, ¶12, 754 NW2d 813, 818-19 (citations omitted).

[¶21.]     [A] ministerial act is defined as *absolute, certain, and imperative,* involving merely the execution of a specific duty arising *from fixed designated facts* or the execution of a set task imposed by law prescribing and *defining the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion*, being a simple, definite duty arising under and because of stated conditions and imposed by law. A ministerial act envisions direct adherence to a *governing rule or standard* with a compulsory result. *It is performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action.*

*Hansen,* 1998 SD 109, ¶23, 584 NW2d at 886 (citations omitted) (emphasis in original and added). *See also King*, 2007 SD 2, ¶12, 726 NW2d at 607; *Wulf*, 2003 SD 105, ¶20, 669 NW2d at 142; Casazza v. State, 2000 SD 120, ¶13, 616 NW2d 872, 875-76. "If the duties do not fall within [these] definition[s], they are not ministerial and thus are discretionary for this is the limits of the abrogation of sovereign immunity authorized by the Legislature." *Hansen,* 1998 SD 109, ¶23, 584 NW2d at 886.

[¶22.] In order to find a duty "ministerial," we must find a "governing rule or standard" so clear and specific that it directs the government actor without calling upon the actor to ascertain how and when to implement that rule or standard. Moreover, in *Hansen,* we reviewed the duties of that DOT official and noted "one could not pluck an ordinary citizen off the street and expect they could successfully execute the duties of [this office]." 1998 SD 109, ¶29, 584 NW2d at 887-888. *See also Wulf*, 2003 SD 105, ¶29, 669 NW2d at 146.[7]

**Nature of the Duties Under SDCL 31-28-6**

[¶23.] SDCL 31-28-6 provides:

> The public board or officer whose duty it is to repair or maintain any public highway shall erect and maintain *at points in conformity with standard uniform traffic control practices* on each side of any sharp turn, blind crossing, or other point of danger on such highway, except railway crossings marked as required in § 31-28-7, a substantial and conspicuous warning sign, which sign shall be on the right-hand side of the highway

---

7. Compare with *Kyllo v. Panzer*, 535 NW2d 896 (SD 1995) wherein we held an automobile being driven by a state employee was a ministerial duty. Presumably one could pluck off the street an adult in South Dakota and be assured that the vast majority were capable of driving an automobile.

approaching such point of danger. A violation of this section is a Class 1 misdemeanor.

(Emphasis added.) Truman alleges that the omission of warning signs at Four Corners is a violation of a *ministerial* duty under SDCL 31-28-6. We disagree.

[¶24.] Under SDCL 31-28-6, the "governing rule or standard" is not the mere presence of a "sharp turn, blind crossing, or other point of danger," but the existence of "standard uniform traffic control practices." *See id.* Contrary to Truman's position presented at oral argument, the language "in conformity with standard uniform traffic control practices" does not refer to the characteristics of the "substantial and conspicuous warning sign."[8] Instead, this phrase, "in conformity with standard uniform traffic control practices," plainly modifies the "points" at which signs "shall" be located. Therefore, any ministerial duties pertaining to the placement of traffic control signs under this statute must be required by standard uniform traffic control practices.

[¶25.] The placement of signs in situations that have neither standard nor uniform practices must *necessarily* be outside any ministerial requirements of SDCL 31-28-6. We have previously held that such sign placement, per SDCL 31-28-6, requires "the exercise of judgment or discretion as to the propriety of the action." *Hansen,* 1998 SD 109, ¶23, 584 NW2d at 886. Therefore, in order to establish a ministerial duty under this statute, "standard uniform traffic control practices" must exist and delineate at which specific points signs must be erected at this type of intersection. *See* SDCL 31-28-6.

---

8. Such characteristics include the size, shape and color of warning signs.

[¶26.] This rule is neither new nor novel. In *Bickner v. Raymond Township,* summary judgment was unanimously affirmed by this Court, in part, because "Bickner cite[d] no provision in the MUTCD [a standard uniform traffic control manual] that specifically requires a township to erect a warning sign in these circumstances." 2008 SD 27, ¶14, 747 NW2d 668, 672. As in *Bickner,* Truman has failed to provide specific governing provisions from the MUTCD or any other standard uniform traffic practice for intersections like Four Corners. The MUTCD diagrams Truman has presented depict other types of intersections. These other designs are inapplicable. *See infra* ¶¶37-40.

[¶27.] While Truman and the dissent seek to limit *Bickner's* holding to the failure of the plaintiff to cite to a specific section of the MUTCD manual, the actual holding was broader and consistent with *Hansen* and *Fritz v. Howard Tp.*, 1997 SD 122, 570 NW2d 240. In *Bickner* we held: "The [governmental entity] also cannot be held liable under SDCL 31-28-6 because the [entity's] decision to erect a warning sign in the first place is protected by the doctrine of sovereign immunity. As this Court recognized in *Hansen,* the initial decision to erect warning signs is *discretionary*." 2008 SD 27, ¶14, 747 NW2d at 672 (emphasis added).

[¶28.] The dissent makes much of the word "shall" as a mandatory directive as it is found in the text of SDCL 31-28-6. *See infra* ¶¶53-54. However, "[s]tatutes and court rules must be construed in their entirety. The effect of the word 'shall' may be determined by the balance of the text of the statute or rule." Discover Bank v. Stanley, 2008 SD 111, ¶21, 757 NW2d 756, 762-63 (citations omitted). In an examination of the text of SDCL 31-28-6, it is only when that public official in the

exercise of his or her discretion determines that the public highway contains "any sharp turn, blind crossing or other point of danger on such highway" based upon "standard uniform traffic control practices" that he or she "shall erect and maintain . . . a substantial and conspicuous warning sign . . . ."[9] The statute contained "shall" in 1997 when the dissenter of today authored the unanimous opinion of *Fritz* in which he held contrary to the position he now espouses:

> *Kiel* [*v. DeSmet Tp.*] repeats a prior holding of this court, i.e., "that the failure of a governing board or body to install a road sign in the first instance does not give rise to a cause of action under [analogous statutes]." 90 SD [492,] at 497, 242 NW2d [153,] at 156 [(1976)] (citing Dohrman v. Lawrence County, 82 SD 207, 143 NW2d 865 (1966); Reaney v. Union County, 69 SD 392, 10 NW2d 762 (1943)). Those cases dealt, not with defects such as the washout in this case but with instances where a sign was *never* erected to warn of sharp curves (*Dohrman; Reaney*) or steep hills (*Dohrman*). The rationale for not imposing liability for failure to erect warning signs was that these conditions were inherent in the design or plan of the highway and did not result from the highway becoming defective because it fell out of repair. *Dohrman*, 82 SD at 210-11, 143 NW2d at 867; *Reaney*, 69 SD at 397, 10 NW2d at 764. Furthermore, as the *Kiel* court noted, *"It may be assumed that public authorities in the discharge of their duties under this statute have a measure of discretion in determining what curves, crossings and other points of danger require a warning sign and failure to erect or install one, is not ordinarily actionable."* 90 SD at 496, 242 NW2d at 155.[10]

---

9.     The dissent ignores the qualifying language, "at points in conformity with standard uniform traffic control practices," in discussing the duties under SDCL 31-28-6. As a consequence, the dissent would supplant jury determinations for the statute's uniform standards. Such a conclusion radically alters the discretionary/ministerial distinction from a question of law to a question of fact, contrary to our longstanding precedent. *See supra* ¶10.

10.    The dissent suggests that the duties under SDCL 31-28-6 are ministerial *because* the statute provides for misdemeanor criminal penalties. *See infra* ¶59. Following the dissent's rationale, the existence of the criminal

(continued . . .)

1997 SD 122, ¶15 n3, 570 NW2d at 243 n3 (emphasis added). The basis of his 1997

opinion was well founded as it soundly rested upon *Kiel,* which was also a

unanimous opinion of this Court. Moreover, in *Hansen,* we examined the issue for a

---

(. . . continued)

> penalty itself makes *all* sign placement ministerial. The dissent declares that "the duties [under SDCL 31-28-6] are not discretionary." *Id.* This directly contradicts the quoted passage from *Fritz,* which today's dissenting author wrote. Furthermore, if the dissent were correct and the criminal penalty is the "fatal defect to the majority's reasoning," then all of our previous cases finding discretionary duties under SDCL 31-28-6 have the same fatal defect and would have to be overruled. Cases decided under SDCL 31-28-6 and predecessor statutes: *Bickner*, 2008 SD 27, 747 NW2d 668 ("[T]here exists 'a measure of discretion when determining when warning signs are necessary and that failing to erect signs is generally not actionable.'"); *Hansen,* 1998 SD 109, 584 NW2d 881 (Finding the placement of warning signs a discretionary act in the absence of uniform traffic control practices); *Fritz*, 1997 SD 122, 570 NW2d 240; *Kiel* , 90 SD 492, 242 NW2d 153 (1976) (adopting and quoting Jensen v. Hutchinson County, 84 SD 60, 166 NW2d 827 (1969) (Hanson, J., dissenting)); *Dohrman*, 82 SD 207, 143 NW2d 865 (1966); *Reaney* , 69 SD 392, 10 NW2d 762 (1943).

> Further, the only ministerial duties that arise under SDCL 31-28-6 and could lead to criminal penalties are found in "standard uniform traffic control practices." According to the plain language of the statute, it is only these "standard . . . practices" that the Legislature has mandated and penalized. This is all that the Legislature has stated "shall" be done. The dissent fails to address this *qualifying* language in the statute. The Legislature has not required performance in non-standard situations. Decisions regarding sign placement in non-standard traffic control practices must be discretionary.

> In order to evade sovereign immunity, the dissent transforms Griese's discretionary duty into a ministerial one by "reading out" the statute's "standard . . . practices." In effect, this "reading out" is as much a "species of judicial legislation" as if we were to "hold that the counties are . . . made liable for injuries caused by defects in . . . bridges, in the absence of legislation making them so liable." *Bailey*, 59 NW at 221; s*ee supra* ¶18.

third time and construed SDCL 31-28-6 as creating a discretionary duty upon the defendant protected by sovereign immunity. [11]

[¶29.]    Additionally, Truman fails to recognize that in order for a government actor to be "in conformity with" standards and to "perform [them] in a *prescribed manner,*" the standard must preexist the *act* itself. Without preexisting standards, there is no stated *policy* for the state actor to implement.[12] If the Legislature or other policy maker has not demanded performance, the decision to act or not is discretionary. Furthermore, absent evidence of *new* standards for this traffic design, Truman implicitly challenges the *initial* engineering and design of Four Corners. As stated above, omissions from the initial engineering and design are clearly protected by sovereign immunity. *See supra* ¶13.

[¶30.]    Ultimately, Truman argues that Four Corners contains a design that he believes is unsafe. Because of its non-standard design, he is unable to establish standard uniform traffic control practices regarding the placement of warning signs.

---

11.    The dissent once again raises the same type of arguments that it raised in its solitary dissent in *Hansen* and which we rejected at that time. We continue to reject those arguments today. *See* 1998 SD 109, ¶¶ 39-54, 584 NW2d 881, 889-895 (Sabers, J., dissenting).

12.    This Court has previously recognized the distinction between creating governmental policy and merely implementing the same. *See King,* 2007 SD 2, ¶11, 726 NW2d at 607 (quoting *Kyllo v. Panzer*, 535 NW2d 896, 902 (SD 1995)) (noting that sovereign immunity extends to employee's discretionary acts because "such discretionary acts participate in the state's sovereign *policy-making* power.") (emphasis added); *Wulf,* 2003 SD 105, ¶20, 669 NW2d at 143 ("a ministerial act is the simple carrying out of a policy already established. . ."); Nat'l Bank of SD v. Leir, 325 NW2d 845, 850 (SD 1982).

Without standard uniform traffic control practices, the placement or omission of signs by government actors is discretionary under SDCL 31-28-6. [13]

[¶31.]       *Wulf*, 2003 SD 105, 669 NW2d 135, so heavily relied upon by Truman and the dissent, is obviously distinguishable. *See infra* ¶¶62-65. It did not deal with SDCL 31-28-6 or the subject of the placement of highway signage. More importantly, *Wulf* dealt with a very specific DOT policy regarding sanding and plowing roadways during snowstorms. This policy dictated exactly when and how sanding was to occur. The *Wulf* court followed *Hansen* in concluding that the specific DOT Policy 2571, regarding the times and methods for sanding in a snowstorm, amounted to a virtual check-list with no discretion as to *whether* to do sanding, *when* to do it, or *how* to do it. Thus, the duties of the defendant DOT supervisors "may be defined and applied with relative ease," and were ministerial. *Wulf*, 2003 SD 105, ¶32, 669 NW2d at 147 (quoting *Hansen*, 1998 SD 109, ¶31, 584 NW2d at 888 (quoting DuBree v. Commonwealth, 393 A2d 293, 295 (Pa 1978)). In reaching this conclusion, we also held that "but for" DOT Policy 2571:

> Decisions made by Senst and Bultje as to how to allocate snow plow operators, resources and equipment, how many workers to call in for any given winter storm event, how many trucks to put on the road at any given time and where on the highways to place those vehicles are all discretionary and subject to sovereign immunity.

---

13.    The question of whether the State should re-engineer, redesign, or reconstruct these types of intersections is beyond the authority of this Court. That is a policy decision best left to the DOT and the Legislature. This Court will defer to their discretion in the design of Four Corners and similar intersections.

*Wulf,* 2003 SD 105, ¶28, 669 NW2d at 145-146. Thus, what limited relevance *Wulf* brings to the question now before us actually supports Griese's argument.

[¶32.] In conclusion, "[a]ny decision regarding the installation of additional markers at this [location] was a discretionary function. The circuit court's grant of summary judgment has not been shown to be improper as sovereign immunity bars [plaintiff's] negligence claim against the DOT employees." *King,* 2007 SD 2, ¶21, 726 NW2d at 610.

### Truman's Evidence and Material Facts
### Concerning Sovereign Immunity

[¶33.] In order to determine whether the sovereign immunity defense applies, a court must, to some extent, consider the factual context of the case. A valid basis for summary judgment exists when the legal conclusion is made that an act was discretionary in its context, thus under the aegis of sovereign immunity. However, Truman and the dissent argue that the MUTCD diagrams and other evidence create a question of fact. Because a question of fact exists, they argue, a jury should determine the applicability of these diagrams. Further, they argue, this question of fact precludes summary judgment. We disagree.

[¶34.] The introduction of factual information in order to properly categorize a government actor's duty as ministerial or discretionary does not transform sovereign immunity analysis from a question of law to a question of fact.

> [I]n the final analysis, the decision as to *whether a public official's acts are discretionary or ministerial must be determined by the facts of each particular case* after weighing such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity.

*Hansen,* 1998 SD 109, ¶23, 584 NW2d at 886 (citations omitted) (emphasis in original). We have consistently held that a determination of sovereign immunity and whether the governmental duty was discretionary is a question of law for the courts. *See supra* ¶10. To place such an issue in the hands of the jury is a de facto judicial repeal of sovereign immunity and relegates the matter to a jury question of negligence. Instead of a single standard concerning the application of sovereign immunity, as is cited in the cases above from *Ruth* in 1896 onward, such a repeal would lead to each of our State's 66 counties having its own standard for sovereign immunity, set not by the Legislature, but by a local county jury.

[¶35.]     Even if Truman's evidence did raise what he argues are factual issues, this evidence would not create a question for the jury. "The existence of a duty in a negligence action is a question of law. . . ." Kirlin v. Halverson, 2008 SD 107, ¶10, 758 NW2d 436, 444 (quoting Hohm v. City of Rapid City, 2008 SD 65, ¶3, 753 NW2d 895, 898 (citing State Auto Ins. Cos. v. B.N.C., 2005 SD 89, ¶20, 702 NW2d 379, 386)). The doctrine is the same when a motorist sues a governmental entity over the conditions of highways under its jurisdiction. *Fritz*, 1997 SD 122, ¶8, 570 NW2d at 242. When the defendant is a government actor, however, sovereign immunity analysis requires a further classification of the defendant's duty. The trial court must classify the defendant's duty as either discretionary or ministerial. This is a *legal* determination. *See supra* ¶10. Therefore, the factual circumstances that inform the trial court's classification are part of the trial court's *duty* analysis. The factual circumstances are only applicable to the legal questions of the existence or classification of a government actor's *duty*; they are *not relevant* to the jury's domain

in deciding issues of breach, causation, and damages. Therefore, consideration of these circumstances does not diminish the jury's role. Truman's argument is incorrect. The evidence he presents does not *automatically* create a question for the jury or preclude summary judgment.

[¶36.]    Truman also suggests that the trial court erred because his evidence establishes that Griese's duties are ministerial. After considering the evidence presented, we disagree. One of *Truman's* experts believes that the curve on U.S. 14 was constructed "to allow free flow of traffic along U.S. 14 from east west to north south." Further, "the curve [was] installed to provide a high speed transition for the major road[, U.S. 14]." The MUTCD designs offered by Truman do not show or contain this traffic design or this type of interchange.[14]

---

14.    If SDCL 31-28-6 were interpreted to require the government actor to apply standardized diagrams to non-standard intersections, he or she would be forced to use his or her skill and judgment to alter the designs to the traffic scenario presented at Four Corners. Such an adaptation, essentially, would be an exercise of his or her discretion.

Moreover, the MUTCD signage designs do not require direct adherence. Instead, MUTCD defers to engineering judgment and studies when making sign placement decisions. Therefore, the MUTCD requires the engineer to exercise his or her discretion and expertise.

Section 2A.03 – Standardization of Application provides:
> . . .
> Guidance: Signs should be used *only* where justified by *engineering judgment or studies*, as noted in Section 1A.09. Results from *traffic engineering studies* of physical and traffic factors should indicate the locations where signs are deemed necessary or desirable. . . .

(Emphasis added.)

Section 2B.05 STOP Sign Applications provides:

(continued . . .)

[¶37.]     One diagram presented by Truman, the "acute angle intersection,"
focuses solely on the geometry of the U.S. 14/S.D. 63 junction. This design shows a
stop sign at the end of the U.S. 14, contrary to the curve's "free flow" traffic
design.[15] This narrowed focus on one part of Four Corners's geometry neglects the
multiple traffic factors presented, and portrays a totally different traffic scenario
and design. The diagram's "acute angle," or "sharp turn" as Truman argues, is a

_____

(. . . continued)

> Guidance: STOP signs *should* be used if *engineering judgment*
> indicates that one or more of the following conditions exist. . . .

(Emphasis added.)

Section 2B.08 YIELD Sign Applications provides:
> Option: YIELD signs may be used instead of STOP signs if
> *engineering judgment* indicates that one or more of the following
> conditions exist. . .
>> D. An intersection where a special problem exists and
>> where *engineering judgment* indicates the problem to
>> be susceptible to correction by the use of the YIELD
>> sign.

(Emphasis added.).

15.    Truman suggests that traffic on U.S. 14 makes a left-hand turn
onto S.D. 16/U.S. 14. This is not accurate. The curve creates a *continuous*
path for U.S. 14 throughout the transition. No turn is required. This
diagram does not represent the same traffic or geometric design; it is not the
"exact same design." *See infra* ¶69. *Truman's* expert suggests that the
continuous "free flow" of traffic on U.S. 14 was part of the planned design
when the curve was installed decades ago. The curve was installed so that
traffic on U.S. 14 did not have to proceed to the "T" intersection, stop moving,
and then turn to continue. Quite simply, Truman and the dissent suggest
returning to a traffic design similar to that which existed before the curve
was installed; traffic on U.S. 14 (the "major road") stops before proceeding. In
essence, they suggest that the implementation of a "free flow" traffic design
on U.S. 14 is problematic. Their positions, therefore, directly challenge the
roadway's initial engineering and design. The initial design is protected by
sovereign immunity. *See* supra ¶13.

right-hand turn from the angled street onto the horizontal street. However, traffic on U.S. 14 does not make a right-hand "sharp turn" onto S.D. 63. Drivers approaching Four Corners from U.S. 14/S.D.34 who want to reach S.D. 63's continued path proceed straight on S.D. 34 to the "T" intersection where S.D. 63 and 34 merge. This "acute angle" diagram does not depict the traffic design of Four Corners. Therefore, this diagram is inapplicable.

[¶38.] Similarly, the "channelized intersection" diagram differs in its basic traffic design. The curve of the channelized intersection is a one-way, right-hand turning lane. This design does not permit traffic to travel in both directions on the curve, as evident by the absence of a centerline. Furthermore, the signs depicted in the diagram would not have been visible or applicable to either Truman or Griese, given their directions of travel. This design is also inapplicable.

[¶39.] Truman presents a number of witnesses' deposition testimony, including the Stanley County Sheriff, to suggest the existence of a "blind crossing" or a "point of danger." None of this testimony is relevant to the question of sovereign immunity. Truman and his witnesses provide no statutory definition for what constitutes a "blind crossing" or "point of danger"[16] under any "standard uniform traffic control practice" that would give rise to a ministerial duty. *See* SDCL 31-28-6.

---

16. Although we do not reach the factual issues in this case, the record indicates the following information: the accident rate at Four Corners is 1.08 per million users; the statewide average accident rate during this time period was 2.0 per million users; the 2.0 figure is also used by the DOT as a threshold to justify the spending of Road Safety Improvement funds.

[¶40.] Considering the chain of implications that results from Truman's argument, a logical inconsistency becomes apparent. If the duty in SDCL 31-28-6 is ministerial, then it is not protected by sovereign immunity. If the duty is not protected by sovereign immunity, then a jury must determine what "standard uniform traffic control practices" are. If the jury must determine what "standard . . . practices" are, then these "standard . . . practices" are subject to interpretation. If "standard . . . practices" are subject to interpretation, then they are not "absolute, certain and imperative." *See supra* ¶21. If they are not "absolute, certain and imperative," then they do not fit our definition of "ministerial."[17] If they do not fit our definition of "ministerial," then they are "discretionary." If they are "discretionary," then they are protected by sovereign immunity.

[¶41.] As a matter of law, absent the "standard uniform traffic control practices" required by SDCL 31-28-6, the MUTCD designs and the deposition testimony do not establish a ministerial duty. Truman presents no issues of fact relevant to sovereign immunity. The trial court correctly concluded that Griese's duties were discretionary.

## CONCLUSION

[¶42.] One can only imagine the reaction of an average citizen if he or she, per our analysis in *Hansen* and *Wulf,* were "plucked off the street" and informed it was now his or her legal duty to place "substantial and conspicuous warning signs" at any "sharp turn, blind crossing or other point of danger" as defined by "standard

---

17. This Court's definition of ministerial acts is presented at ¶¶19-22 *supra.*

uniform traffic control practices" on every highway in this state. *See supra* ¶22. How much stronger would their reaction be when they realize that the failure to place a sign in every conceivable place would result in their being subjected to suit and criminal charge[18] simply based on a plaintiff's pleading disagreeing with the initial placement decision, and a jury being allowed to "Monday morning quarterback" his or her conclusions about what is a "sharp turn, blind crossing or other point of danger," even if he or she somehow followed "standard uniform traffic control practices?" There is a reason that the duty to select appropriate places for warning signs was entrusted to defendant Griese, who happens to be the Pierre Region Traffic Engineer of the South Dakota Department of Transportation. Given the thousands of miles of highways in this state that run over all kinds of terrain, such an undertaking is not a ministerial task for amateurs; it calls for a person with professional training to exercise professional discretion in the performance of his or her duties under SDCL 31-28-6.

[¶43.]     SDCL 31-28-6 requires appropriate warning signs in places where "standard uniform traffic control practices" indicate or where the exercise of the engineer's discretion determines a "sharp turn, blind crossing or other point of danger" exists. Thus, there are basically three options when one looks at SDCL 31-28-6:  signs everywhere, signs nowhere, or signs at some points placed there by the exercise of the collective discretion of experts as expressed in uniform standards and the individual discretion of experts in non-standardized situations. Under our

---

18.    Violation of SDCL 31-28-6 is a class one misdemeanor.

settled law, absent applicable uniform standards, the individual expert's decisions are protected by sovereign immunity until the Legislature decides otherwise.

[¶44.]    The serious consequences of this accident are tragic. Yet, sovereign immunity precludes this action against these defendants. For the above reasons, we affirm.

[¶45.]    KONENKAMP and ZINTER, Justices, concur.

[¶46.]    MEIERHENRY, Justice and SABERS, Retired Justice, dissent.

SABERS, Retired Justice (dissenting).

[¶47.]    I respectfully dissent. Griese argues and the trial court declared that summary judgment was appropriate because "the duty under [SDCL] 31-28-6 is a discretionary duty and therefore . . . sovereign immunity applies." I disagree. In fact, I believe that when certain factual circumstances exist,[19] the duty mandated by SDCL 31-28-6 is ministerial. Additionally, there are at least eight reasons why summary judgment should not have been granted by the trial court and affirmed by the majority of this Court in this case.

---

19.    In footnote 4, the majority claims Truman "presents the issue as [ ] all-encompassing[: ] 'regardless of the facts of any particular case.'" *Supra* ¶8 n4. Truman's statement is taken out of context as he states the issue as follows: "Whether all claims for violation of the mandatory duty imposed by SDCL § 31-28-6 are barred under the doctrine of sovereign immunity, regardless of the facts of any particular case . . . ." Clearly, Truman is not arguing that sovereign immunity should apply or not apply "regardless of the facts of any particular case" as implied by the majority. Rather, Truman is cautioning this Court to consider the far-reaching implications of its decision.

### *Sovereign Immunity & the PEPL Fund*

[¶48.]       "Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment."  Public Entity Pool for Liability v. Score, 2003 SD 17, ¶7 n3, 658 NW2d 64, 67 n3 (citing Alden v. Maine, 527 US 706, 715, 119 SCt 2240, 2247, 144 LEd2d 636 (1999) (citations omitted)).  Specifically, the South Dakota Constitution, Article III, section 27 proclaims:  "The Legislature shall direct by law in what manner and in what courts suits may be brought against the state."  "Therefore, in the absence of legislative enactment the state is immune from liability in tort."  Bego v. Gordon, 407 NW2d 801, 804 (SD 1987).  To that end, our Legislature has defined the conditions for the waiver of sovereign immunity in SDCL 21-32A-1, which states:

> To the extent that any public entity, other than the state, participates in a risk sharing pool or purchases liability insurance and to the extent that coverage is afforded thereunder, the public entity shall be *deemed to have waived the common law doctrine of sovereign immunity* and shall be deemed to have consented to suit in the same manner that any other party may be sued. . . .

(Emphasis added.)

[¶49.]       SDCL ch. 3-22 sets forth the laws governing this state's public entity pool for liability (PEPL) fund.  The first section, in part, sets forth the fund's coverage:

> The purpose of this program is to provide a fund as the sole source for payment of valid tort claims against all member public entities of the state and their officers and employees for all liability they may incur based upon negligence in the operation of motor vehicles or *negligence in performing other acts* within an employee's scope of employment . . . .

#24707

SDCL 3-22-1 (emphasis added).  The breadth of coverage is notable.  However, the

statute continues:

> Excluded from coverage under this chapter are claims involving employee grievances and awards for back pay, workers' compensation, employee health programs, single point-source pollution damage, asbestos related injuries, and claims arising from engineering and design of any public roadway in this state by any employee of any entity.

*Id.*  Additionally, the PEPL Fund Memorandum (memo) includes nearly all the

exclusions listed in the statute and significantly expands the list.[20]  Remarkably,

---

20.   It states, in pertinent part:
      This Memorandum does not extend coverage or apply to any liability:
      1.  Assumed under contract, except this exclusion shall not apply to rental car contracts entered into by employees or to contracts specifically added by endorsement hereto;
      2.  Arising out of the ownership, maintenance or use of any aircraft except this exclusion shall not apply to the extent PEPL purchases insurance for such purposes;
      3.  Due to declared or undeclared war, riot, a concerted act of civil disobedience and similar occurrences or acts or conditions incident thereto.  However this exclusion does not apply to liability arising from actions taken to protect persons or property;
      4.  Under workers' compensation, disability benefits, unemployment compensation or similar laws;
      5.  For bodily injury to an employee arising out of and in the course of employment by the State;
      6.  For injury to the spouse, child, parent, brother, or sister of the employee in 5, above, as a consequence of the bodily injury to that employee;
      7.  Arising out of the actual, alleged, or threatened discharge, release or escape of pollutants;
      8.  Resulting from or contributed to in any manner by the hazardous properties of nuclear material;
      9.  For injuries resulting from or contributed to in any manner by the presence of asbestos;
                                                   (continued . . .)

-25-

#24707

(. . . continued)

10. Arising from or contributed to in any manner by acts, errors or omissions in the engineering or design of any public roadway or public transportation project;

11. For back pay and benefits and any costs relating to reinstatement of an employee, except this exclusion does not apply to any damages which may be awarded to an employee under any federal law or as a result of violations of an employee's rights as guaranteed by the United States Constitution;

12. For employee grievances, actions and awards, except this exclusion does not apply to any damages which may be awarded to an employee under any federal law or as a result of violations of an employee's rights as guaranteed by the United States Constitution;

13. For fines, penalties, punitive damages or exemplary damages;

14. For failure to perform, or breach of, a contractual obligation;

15. Arising out of providing or the failure to provide medical professional services by employees of the University of South Dakota School of Medicine, except this exclusion shall not apply to employees of the University of South Dakota School of Medicine's Division of Health Sciences;

16. For damages that are a result of a discretionary act or task. This exclusion does not apply if the damages are the result of a ministerial act or task;

17. To the extent the occurrence is covered by any valid and collectible liability insurance, except this exclusion shall not apply to liability insurance of the employee that protects the employee while driving a State owned or leased vehicle;

18. For damages measured by contract, as set forth in SDCL ch. 21-2;

19. For damages to property owned by the State;

20. Arising out of the ownership, operation, engineering or design of any airport, landing strip or similar facility. However, this exclusion shall not apply to state-owned hangars in the cities of Brookings, Vermillion, and Pierre, South Dakota;

21. For refund of taxes, fees and assessments;

22. For claims where notice was not given by the claimant within 180 days after the injury or as required by SDCL ch. 3-21;

23. Arising out of the employee obtaining remuneration or financial gain to which the employee was not legally entitled;

24. Arising from collecting or attempting to collect taxes;

(continued . . .)

the statute and the memo exclude very specific claims, including "claims arising from engineering and design of any public roadway[.]" However, neither the statute nor the memo excludes liability for the claim here: failure to erect and maintain substantial and conspicuous warning signs on roadways approaching sharp turns, blind crossings, or other points of danger. Instead, we are left with the following potentially applicable exclusion: "16. For damages that are a result of a discretionary act or task. This exclusion does not apply if the damages are the result of a ministerial act or task[.]" Therefore, when state employees are covered under the PEPL fund, sovereign immunity is waived, to the extent of coverage, for damages resulting from that employee's failure to perform a ministerial duty, but it is not waived for liability resulting from failure to perform a discretionary duty.

---

(. . . continued)

25. Arising from providing or attempting to provide emergency disaster relief services pursuant to SDCL ch. 33-15;
26. Arising from activities or facilities of the South Dakota Building Authority or its employees;
27. Arising from activities or facilities of the South Dakota Health and Educational Facilities Authority or its employees;
28. Arising from activities or facilities of the South Dakota Housing Development Authority or its employees except this exclusion shall not apply to the South Dakota Housing Development Authority, its commissioners, officers and employees, with respect to liability arising from the construction of residential and other structures under the Governor's House and Daycare Building Project at Mike Durfee State Prison in Springfield, South Dakota;
29. Arising from activities or facilities of the South Dakota Science and Technology Authority;
30. Arising out of the employee's willful and wanton misconduct.

PEPL Memorandum of Liability Coverage to the Employees of the State of South Dakota 13-15. The specificity of several of the exclusions is notable.

[¶50.] If the Legislature wanted to provide immunity for failing to erect and maintain signage, it could have simply removed the act from the broad coverage of the statute. It chose not to do so. Instead, this Court is left to determine whether the act is discretionary or ministerial.

***Sovereign Immunity: Discretionary vs. Ministerial***

[¶51.] A dichotomy exists: ministerial or mandatory acts are provided no immunity, while discretionary acts are immunized. The difficulty arises in distinguishing the discretionary acts from those that are ministerial. South Dakota case law has identified factors helpful in drawing this distinction. These factors include:

> (1) The nature and importance of the function the officer is performing;
>
> (2) The extent to which passing judgment on the exercise of discretion by the officer will amount necessarily to passing judgment by the court on the conduct of a coordinate branch of government;
>
> (3) The extent to which the imposition of liability would impair the free exercise of his discretion by the officer;
>
> (4) The extent to which the ultimate financial responsibility will fall on the officer;
>
> (5) The likelihood that harm will result to members of the public if the action is taken;
>
> (6) The nature and seriousness of the type of harm that may be produced;
>
> (7) The availability to the injured party of other remedies and other forms of relief.

King v. Landguth, 2007 SD 2, ¶11, 726 NW2d 603, 607 (citations omitted). Upon applying these factors to this case, it is important to recognize that liability will not

fall upon the officer exercising his duty, the likelihood of harm to the public is great, and the nature and seriousness of the harm is extremely grave. Moreover, passing judgment on the officer's discretion will not be passing judgment upon a separate branch of government and there is no real availability of relief to the injured parties. Therefore, these factors favor the conclusion that the act at issue was ministerial, not discretionary.

***Statutory Interpretation & Genuine Issues of Material Fact***

[¶52.]    Due to the language of SDCL 31-28-6, however, the ministerial/discretionary analysis is not even necessary. The statute provides:

> The public board or officer whose duty it is to repair or maintain any public highway *shall erect* and *maintain* at points in conformity with standard uniform traffic control practices *on each side* of any sharp turn, blind crossing, or other point of danger on such highway . . . a *substantial* and *conspicuous warning sign*, which sign shall be on the *right-hand side* of the highway approaching such point of danger. A violation of this section is a Class 1 misdemeanor.

SDCL 31-28-6 (emphasis added). This Court has previously recognized the distinction between creating governmental policy and merely implementing the same. *See King*, 2007 SD 2, ¶11, 726 NW2d at 607 (noting that sovereign immunity extends to employee's discretionary acts because "'such discretionary acts participate in the state's sovereign *policy-making* power'" (quoting Kyllo v. Panzer, 535 NW2d 896, 902 (SD 1995) (emphasis added))); Wulf v. Senst, 2003 SD 105, ¶20, 669 NW2d 135, 143) ("a ministerial act is the simple carrying out of a policy already established" (internal citations omitted)); Nat'l Bank of S.D. v. Leir, 325 NW2d 845, 850 (SD 1982) ("Although some discretion in its literal sense is involved in foster care, social workers do not make policy decisions involving foster care placement.

The criteria for placement . . . [is] already established.  Social workers are merely required to carry out or administer these previously established standards.").

[¶53.]        Here, however, by using the word "shall," the statute sets forth a mandatory duty:  signs *shall* be erected when a sharp turn, blind crossing or other point of danger exists.  "Shall" is a mandatory directive.  Fritz v. Howard Twp., 1997 SD 122, ¶15, 570 NW2d 240, 242 ("When 'shall' is the operative verb in a statute, it is given 'obligatory or mandatory' meaning.").  In a recent opinion authored by Chief Justice Gilbertson, this Court unanimously declared that the word "shall" directs mandatory action, leaving no room for discretion.  We stated, "The statutory definition of 'shall' . . . 'manifests a *mandatory* directive and *does not confer any discretion* in carrying out the action so directed.'"  2008 SD 111, ¶21, 757 NW2d 756, 762 (quoting SDCL 2-14-2.1) (emphasis added).  There is a distinction between policy making discretion and operational judgment.  The defendants were not creating policy.  This statute does not require an exercise of discretion.  Rather, the employees were only required to make a factual judgment regarding the conditions of the road.  This is the only interpretation consistent with the plain language of the statute, and which preserves legislative intent.  Obviously, the Legislature intended South Dakota travelers to be protected from and warned about these points of danger, blind crossings, and sharp turns.

[¶54.]        Curiously, the majority opinion, also penned by Chief Justice Gilbertson, claims that the duties set forth in SDCL 31-28-6 under the directive of the word "shall," are in fact discretionary duties, rather than mandatory.  With all due respect, it is preposterous to attach opposite definitions to the same word just to

achieve a certain result. If we interpret SDCL 31-28-6 to be entirely discretionary, as the majority purports to do, the employees could ALWAYS avoid liability by simply and arbitrarily saying the intersection was not a point of danger, blind crossing, or sharp turn, despite compelling evidence to the contrary. To interpret SDCL 31-28-6 in this manner would render useless the mandatory directive "shall." Moreover, that interpretation "is precisely the kind of absurd result we have always said our statutory interpretation should avoid." Dep't of Social Services *ex rel.* Wright v. Byer, 2004 SD 41, ¶17, 678 NW2d 586, 590-91. If the Legislature intended the duties to be discretionary, it would have chosen more appropriate statutory language.

[¶55.]      Rather, in accordance with the mandatory directive, the defendants had no discretion in deciding whether to erect and maintain the appropriate signage if there was any sharp turn, blind crossing, or other point of danger. If any of these conditions existed, the defendants were required to follow the law and construct the signs. Truman claims that the Four Corners intersection qualifies as a sharp turn, a blind crossing,[21] *and* a point of danger. Conversely, Griese claims that this intersection does not meet any of those three characterizations. Importantly, whether one or more of these conditions in fact existed raises a genuine issue of material fact as to each condition. Such a determination should be decided by a jury. Under these circumstances, summary judgment should not have been granted or affirmed.

---

21.   The record contains pictures and testimony indicating this Y configuration qualifies as a "blind crossing." *See* Attachment 2.

[¶56.]     Griese impliedly makes the alternative argument that even if the Four Corners intersection can be characterized as a sharp turn, blind crossing, or other point of danger, the statutory duty was met because the double yellow line in the center of U.S. 14 indicates that northbound traffic on U.S. 14 must yield to incoming traffic from S.D. 34.  Griese claims this double yellow line was sufficient to adequately warn of the danger.  The double yellow line raises at least three genuine issues of material fact:[22]  (1) whether a double yellow line is a substantial and conspicuous warning sign to the driver that he is required to yield to oncoming traffic before proceeding across that lane of traffic; (2) whether the double yellow line is "on the right-hand side of [each side of] the highway approaching such point of danger[;]" and (3) whether a double yellow line conforms to the standard uniform traffic control practices, for which South Dakota adopted the Manual on Uniform Traffic Control Devices (MUTCD) in the South Dakota Local Government Roads Signing Reference (SDLGRSR).[23]

[¶57.]     Section 2B of the MUTCD states that "regulatory signs shall be used to inform road users of selected traffic law or regulations and indicate the applicability

---

22.    I fail to understand how the majority can deny there are genuine issues of material facts as to whether the officer "erect[ed] and maintain[ed] . . . substantial and conspicuous warning sign[s] on the right-hand side" of "each side of any sharp turn, blind crossing, or other point of danger[,]" and specifically, whether the double yellow line meets these statutory requirements.

23.    The Foreword to the SDLGRSR states:  "this publication is made up primarily of excerpts taken from sections or parts of the Manual on Uniform Traffic Control Devices, 2003 Edition."  No differences between the two sources were found with regard to the sections pertinent to this case; therefore, references will be made only to the MUTCD to prevent confusion.

of the legal requirements." MUTCD 2B.01, Application of Regulatory Signs (Plaintiff's Exhibit 6). If Griese and the DOT expected the double yellow line to serve as an indicator that north-bound traffic was to yield, and not just that passing was prohibited on this stretch of road,[24] then a regulatory sign may be mandatory under this section.

[¶58.]    Each of these points raises genuine issues of material facts as to whether the double yellow line meets both the plain language of SDCL 31-28-6 and the requirements of the MUTCD section 2B.01. These are issues that should be decided by a jury. *See Fritz*, 1997 SD 122, ¶16, 570 NW2d at 243. In this regard, the grant of summary judgment was again inappropriate.

[¶59.]    Lastly and importantly, the Legislature made violation of this statute a Class 1 misdemeanor. If, as the majority holds, SDCL 31-28-6 provides the highway officer discretion to erect and maintain a substantial and conspicuous warning sign, then why did the South Dakota Legislature make it a crime to violate the statute? The answer is simple: the duties are not discretionary. Criminalizing discretionary duties defies common sense. This is a fatal defect to the majority's reasoning. Understandably, the Legislature wants its citizens safe from perilous highway conditions that may be known to the highway department, but unknown to the drivers of the road. Griese had a duty to abide by the statute under certain circumstances, and failure to do so would be a Class 1 misdemeanor.

---

24.    The MUTCD explains a double yellow line "indicates that passing is prohibited in both directions on an undivided road or highway." Manual on Uniform Traffic Control Devices, available at www.mutcd.fhwa.dot.gov (accessed on April 8, 2008).

*Case Law*

[¶60.] South Dakota case law supports the determination that summary judgment was improper here. In *Hansen v. South Dakota Department of Transportation*, 1998 SD 109, 584 NW2d 881, the plaintiff suffered bodily injury when her right front car wheel dropped into a hole that a construction crew created on a bridge on Interstate 29. Hansen appealed the trial court's decision to grant the defendant's motion to dismiss based on sovereign immunity. In affirming the lower court, this Court noted that when a decision cannot be measured against a predictable standard of care then the task is discretionary, thus invoking sovereign immunity. *Id.* ¶23 (quoting 57 AmJur2d Municipal, County, School & State Tort Liability § 120, at 132-33 (1988)). Based on this holding, Griese claims that *Hansen* awards the governmental entity sovereign immunity under *any* set of facts. That conclusion is incorrect.

[¶61.] Griese and the majority opinion fail to acknowledge that in *Hansen*, we observed that "'[w]here . . . *a standard of care may be defined and applied with relative ease*, the public servant is not similarly deterred and the public interest in the protection of the official weakens.'" *Id.* ¶31 (quoting DuBree v. Commonwealth, 393 A2d 293, 295 (Pa 1978)) (emphasis added). The standard may be "written or the product of experience," *id.* ¶23, and other jurisdictions have noted that if the MUTCD mandates the traffic control device, it is not discretionary. *Id.* ¶31 (quoting Patton v. City of Cleveland, 641 NE2d 1126, 1130 (OhioCtApp 1994)). Both SDCL 31-28-6 and the MUTCD dictate the governing standards for erecting and maintaining roadway signage, and the officer simply needs to make a factual

determination of whether the statutory conditions exist, thereby requiring him to carry out his statutory duties. Importantly, *Hansen* did not declare that a violation of SDCL 31-28-6 is *always* discretionary. In fact, the result in *Hansen* may well have been different had the defendant who was sued in *Hansen* been the manager of the road repair crew, instead of the Secretary of Transportation and Director of Highways in charge of over 1,300 employees and a budget of nearly $270,000,000 in 1994. *See id.* ¶22. Obviously, as the Secretary of Transportation and Director of Highways, his duties were generally discretionary and he was *not* the manager of the road crew. The instant case, however, involves the DOT Pierre Region Traffic Engineer and DOT employees – the precise people charged with carrying out this statutory duty.

[¶62.]    Even if the duties set forth in SDCL 31-28-6 were discretionary, a fact which I do not concede, summary judgment is improper if there are genuine issues of material fact. To support this proposition, Truman cites several cases. In particular, he claims *Wulf*, 2003 SD 105, 669 NW2d 135; *Kyllo*, 535 NW2d 896; *National Bank of South Dakota*, 325 NW2d 845; and *Bego,* 407 NW2d 801, support his argument.

[¶63.]    In *Wulf,* 2003 SD 105, ¶4, 669 NW2d at 138, the DOT contracted out its winter road maintenance duties to Preheim Lawn and Landscape, Inc. The DOT had established a winter safe highway maintenance plan for snow removal, sanding and deicing as required by SDCL 31-5-8.3. In particular, the sanding policy required the use of a specified sand/salt/chemical mixture and to commence sanding at "5:00 a.m. [and continue] until 7:00 p.m. . . . unless (1) the traffic is moving safely

or (2) conditions become too hazardous for continued operations." *Id.* ¶31. While the trial court granted summary judgment because "the decision to stop plowing and sanding due to its ineffectiveness was a judgment call," this Court held that the trial court's grant of summary judgment was improper because there were disputed issues of material facts regarding the effectiveness of sanding, whether the traffic was moving safely, and whether the proper sand/salt/chemical mixture was used. *Id.*

[¶64.]      The concurrence in part and dissent in part in *Wulf* noted that "[t]he distinction between creating and implementing government policy should not be ignored when determining whether sovereign immunity applies." *Id.* ¶43 (Sabers, J., concurring in part and dissenting in part). "*Creating* governmental policy requires discretion and is entitled to sovereign immunity protection. *Implementing* governmental policy is ministerial and is not entitled to sovereign immunity protection." *Id.* (emphasis in original); *see also id.* ¶32 (majority opinion) ("'[O]nce it is determined that the act should be performed, subsequent duties may be considered ministerial.'" (quoting *Hansen*, 1998 SD 109, ¶23, 584 NW2d at 886)). Furthermore, the concurrence/dissent in part noted that "[a]lthough [the defendants] had *some* discretion as to how and when to perform their duties, that discretion did not rise to the level of creating policy or shield them from liability for negligence, if proven." *Id.* ¶53 (emphasis in original). See also cases cited in ¶52, *supra*; Elton v. County of Orange, 3 CalApp3d 1053, 1058, 84 CalRptr 27, 30 (1970) (decisions regarding foster children "may entail the exercise of discretion in a literal

sense, but such determinations do not achieve the level of basic policy decisions, and thus do not [warrant immunity]").

[¶65.]   This case is similar to *Wulf*.  There, the DOT policy mandated the roads be sanded from 5 a.m. to 7 p.m. unless certain factual circumstances existed.  Here, the Legislature mandated that warning signs be erected and maintained if certain factual circumstances existed.  In *Wulf*, we determined that whether those certain factual circumstances existed created a genuine issue of material fact to be decided by the jury.  Here, whether certain factual circumstances exist similarly creates genuine issues of material facts to be decided by the jury.  Summary judgment was improper in *Wulf*, and therefore is similarly improper here.

[¶66.]   Likewise, *Kyllo*, 535 NW2d at 903, *Leir*, 325 NW2d at 848, and *Bego*, 407 NW2d at 805, all reaffirmed the principle that state employees should be held liable for negligently performing ministerial acts.  These cases imply that a jury trial should be afforded so the employee's liability, if any, can be determined.

[¶67.]   Furthermore, we presume the Legislature is aware of two of our cases, *Fritz*, 1997 SD 122, 570 NW2d 240, and *Braun v. New Hope Township*, 2002 SD 67, 646 NW2d 737, where sovereign immunity was waived for violations of SDCL 31-28-6.  Specifically, in *Braun*, we noted that "SDCL 31-28-6 *requires* townships to *erect* 'substantial and conspicuous warning sign[s]' on the right-hand side of the highway for 'point[s] of danger.'"  2002 SD 67, ¶17, 646 NW2d at 741 (emphasis added).  This is hardly the type of language that leads one to the result that SDCL 31-28-6 relieves an actor of liability for failure to erect a sign.

[¶68.]     The majority's conclusion in this case directly conflicts with our recent cases of *Bickner v. Raymond Township*, 2008 SD 27, 747 NW2d 668, and *King*, 2007 SD 2, 726 NW2d 603. In *Bickner*, summary judgment was affirmed in part because "Bickner cite[d] no provision in the MUTCD that specifically requires a township to erect a warning sign in these circumstances." 2008 SD 27, ¶14, 747 NW2d at 672 (citation omitted). Here, Truman claims that the curve is an "acute angle curve." MUTCD has "designated the 'acute angle intersection' as one of its typical examples for placement of warning signs at intersections." Importantly, *Bickner* did not declare that the governmental entity is *always* immune from liability under any factual circumstances. Likewise, in *King*, summary judgment was affirmed because the plain language of the MUTCD provision only required a single sign to be placed at the culvert, not two double sided signs as advocated by the plaintiff. 2007 SD 2, ¶¶19-21, 726 NW2d at 609-10. Therefore, these cases are distinguishable from the case before us.

[¶69.]     MUTCD Figure 2A-2 depicts an acute angle intersection. This figure and the accident site have the exact same design. *Compare* Attachment 3 *with* Attachment 1 (depiction of accident site at the merging of U.S. 14 and S.D. 63). *See also* Attachment 2. The majority opinion is mistaken in its determination that the figure differs from the accident site because the figure shows a stop sign whereas the U.S. 14/S.D. 63 junction is a "free flow" traffic design with no stop sign.[25] That

---

25.     The "free flow" traffic design of this roadway, allowing for a vehicle in one lane of traffic to cross another lane of oncoming traffic, with no stop sign or signage whatsoever to alert either driver, only accentuates the dangerousness of this roadway.

is Truman's point: the acute angle intersection is a road design for which the MUTCD designates proper placement for a stop sign. Because the U.S. 14/S.D. 63 junction lacked a stop sign, it failed to conform to the MUTCD's specifications. Further, the majority's statement that the two designs are different because "traffic on U.S. 14 does not make a right-hand 'sharp turn' onto S.D. 63" is without merit. A driver on U.S. 14 could just as easily make a right-hand sharp turn onto S.D. 63, as could be done at the acute angle intersection depicted in Figure 2A-2 of the MUTCD.[26] The geometrical and traffic designs of the accident site are the exact same as depicted in the figure. Therefore, Griese violated his statutory duty by not "erect[ing] and maintain[ing] at points in conformity with standard uniform traffic control practices [MUTCD] . . . a substantial and conspicuous warning sign[.]" *See* SDCL 31-28-6.

[¶70.]      Truman also contends that the Four Corners intersection is a known "point of danger." He claims DOT traffic and safety engineer Cliff Reuer had knowledge that the intersection contains two "points of conflict," only one of which is controlled by a stop sign. According to Reuer, crossing a lane of traffic is a point of conflict. Truman's expert Dave Daubert noted that "[t]hese . . . intersections have been judged a problem for at least the past 40 years and need to be replaced or signed to eliminate conflicting movements. . . . As long ago as 1954, manuals were prepared indicating that Y intersections were a problem in regards to right-of-way

---

26. It is far less important for there to be a stop sign where a roadway allows for a right-hand turn into a lane of traffic going in the same direction, than where a roadway permits one to *cross a lane of oncoming traffic*, as in this case.

assignment."[27]  Stop signs, yield signs, other regulatory signs, or warning signs are generally used to prevent accidents at potential "points of danger."  MUTCD section 2B.05 provides guidance as to when stop signs, for example, should be erected.[28]  The existence of any of the conditions listed in section 2B.05, or any of the applicable sections for other signs, creates genuine issues of material facts to be decided by a jury.  Thus, under these circumstances, summary judgment was improper, and this Court should reverse.

[¶71.]	Lastly, the Minnesota court of appeals case, *Ostendorf v. Kenyon*, 347 NW2d 834 (MinnCtApp 1984), provides guidance in this situation.  In *Ostendorf*, the victims collided on a stretch of highway that had three lanes:  two west-bound

---

27.	Daubert's report stated:
>	The manual used for establishing the alignment of roadways was developed by the American Association of State Highway Officials (AASHO) (which SD has adopted, *see King*, 2007 SD 2, ¶15, 726 NW2d at 608) with the first full book form published in 1954 as <u>A Policy on Geometric Design of Rural Highways</u>. The type of intersection which is the subject of this collision is described in the 1954 manual with recommendations on how to improve the safety of the Y intersection.  Even after the curve for US 14 was constructed, the signing and markings could have been installed to make the intersection safe.

28.	Specifically, it states:
>	STOP signs should be used if engineering judgment indicates that one or more of the following conditions exist:
>	A.  Intersection of a less important road with a main road where application of the normal right-of-way rule would not be expected to provide reasonable compliance with the law;
>	B.  Street entering a through highway or street;
>	C.  Unsignalized intersection in a signalized area; and/or
>	D.  High speeds, restricted view, or crash records indicate a need for control by the STOP sign.
>
> MUTCD 2B.05 (2003).

lanes separated from a single east-bound lane by double yellow lines. The traffic signs on this highway, however, complied with MUTCD.

[¶72.]         Ostendorfs sued the state alleging it failed to warn of the hazards of this road through adequate signage. The lower court granted the State's motion for summary judgment on the defense of sovereign immunity. The Minnesota Court of Appeals reversed the summary judgment noting that "[a] discretionary act is one which requires a balancing of complex and competing factors at the *planning*, rather than the *operational*, stage of development." *Id.* at 837 (emphasis added). Furthermore, the court noted that complying with the MUTCD is not enough. Minnesota had a statute providing that the "commissioner may construct and maintain other directional signs upon the trunk highways." The court noted that, according to the statute,

> [T]he legislature apparently contemplated that at some point in the operation and maintenance of a highway, it would become apparent that additional signs were needed. That is the point where the discretion in how to originally place warning signs is exhausted and, as part of maintaining the highway, the *State has a duty to erect more or better signs.*

*Id.* at 838 (emphasis added). Finally, the court noted that the plaintiff provided evidence that the highway had a history of accidents and the state failed in its duty to safely maintain the highway by not placing better or additional warning signs on this stretch of road. The court found that the plaintiffs had, therefore, raised a material issue of fact as to whether the state was negligent in not placing more or better warning signs on the highway. Importantly, the court concluded:

> The State's placement of warning signs on the highway was not a discretionary act after the State had knowledge of a dangerous situation where warning could be provided by additional or

> better signs. Here the appellants raised an issue of material
> fact as to whether the state was negligent in the maintenance of
> its highway and summary judgment was not appropriate.

*Id.* Not only does the South Dakota statute create a duty to erect and maintain warning signs under certain circumstances, but also, here, the state knew that this stretch of highway created a dangerous driving transition. The record reflects a similar accident occurred in the past, additional accidents have occurred at this intersection and there have been several "terrifying 'near misses.'" Stanley County Sheriff Rathbun recalled that on occasion, people have come into his office to report the "near misses." Just as summary judgment was not appropriate in *Ostendorf*, it was not appropriate in this case based on these additional facts.

**CONCLUSION**

[¶73.]     In summary, there are at least eight reasons why summary judgment should not have been granted by the trial court, and affirmed by the majority of this Court:

1. The South Dakota Legislature enacted statutes authorizing the state to obtain liability insurance and waive sovereign immunity "to the extent of liability insurance coverage." State employees are covered under the PEPL fund and sovereign immunity is waived, to the extent of coverage, for damages resulting from that employee's failure to perform a ministerial duty. Statutory interpretation leads me to conclude that the duties set forth in SDCL 31-28-6 are ministerial, on more than one account (i.e., "shall," policymaking discretion vs. operational judgment, and Class 1 misdemeanor classification).

2. The Legislature has *not* removed this specific failure to act from coverage under the PEPL fund; therefore, sovereign immunity is waived for this situation.

3. The state waived sovereign immunity by violating a mandatory duty imposed by SDCL 31-28-6 when it failed to erect and maintain substantial and conspicuous signs at the Four Corners intersection.

4. There are genuine issues of material facts as to whether this roadway constitutes a "sharp turn," and whether a *substantial* and *conspicuous* warning sign was placed *on the right-hand side* of each side of the highway approaching such point of danger.

5. There are genuine issues of material facts as to whether this roadway constitutes a "blind crossing," and whether a *substantial* and *conspicuous* warning sign was placed *on the right-hand side* of each side of the highway approaching such point of danger.

6. There are genuine issues of material facts as to whether this roadway constitutes any "other point of danger," and whether a *substantial* and *conspicuous* warning sign was placed *on the right-hand side* of each side of the highway approaching such point of danger.

7. There are genuine issues of material facts as to whether the double yellow line is a *substantial* and *conspicuous* warning sign to the driver that he is required to yield to oncoming traffic before proceeding across that lane of traffic, whether the double yellow line is *on the right-hand*

*side* of each side of the highway approaching such point of danger, and whether the double yellow line conforms to the MUTCD.

8. There are genuine issues of material facts as to whether crossing a lane of traffic is a point of conflict, and whether the Four Corners intersection meets the MUTCD signage requirements when such "intersections have been judged a problem for at least the past 40 years and need to be replaced or signed to eliminate conflicting movements."

[¶74.] Common sense and South Dakota law directs that the highway officer *shall erect* and *maintain* substantial and conspicuous warning signs under these circumstances. To decide otherwise on summary judgment, as the majority does, is a violation of both the United States and South Dakota Constitutions. *See* US Const amend VII ("In [s]uits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."); SD Const art VI, sec 6 ("The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy . . . ."). By affirming the trial court's grant of summary judgment, this Court violates the plaintiff's state and federal constitutional rights to a jury trial, and undoubtedly, offends traditional notions of justice.

[¶75.] In accordance with our standard of review, this Court is required to view the facts in the light most favorable to the non-moving party. I disagree with the majority and conclude that genuine issues of material facts exist, requiring a reversal and remand for trial.

[¶76.] Chief Justice Gilbertson concludes with the argument that "one can only imagine the reaction of the average citizen if he or she" were "plucked off the street" and required to perform the duties of the engineers of the State Highway Department. I submit he is missing the whole point. The State Highway Department has over a thousand employees who are educated, trained, and equipped to do the jobs the Legislature has mandated them to do. Moreover, the average citizen as a juror continually makes determinations on others' competence, skill, or lack thereof, or outright negligence.

[¶77.] In contrast, I submit that any right-thinking average citizen would be "shocked" to be presented with the substantial injuries, damages, hospitalizations, and the deaths of three people caused by the failure of this highway engineer to do his duty as mandated by the South Dakota Legislature, and then to be told by the majority of this Court that there is no remedy for these injuries and deaths, even though caused by "the want of ordinary care or skill." *See* SDCL 20-9-1. Equally shocking to average South Dakota citizens may be the fact that the majority declares "no remedy" without even providing the constitutional right to a jury trial.

[¶78.] Incredibly, under the majority's view, the Highway Department could arbitrarily, unreasonably, and capriciously design the busiest, most dangerous intersection in South Dakota without stop signs or signage of any kind and *never* be accountable, despite numerous injuries and deaths year after year.

[¶79.] Also incredible, under the majority's view, the Highway Department could arbitrarily, unreasonably, and capriciously design the busiest, most dangerous intersection in South Dakota with inadequate signage or signage that

goes out of repair, as here, and never be accountable, despite numerous injuries and deaths year after year.

[¶80.]    I am not suggesting a directed verdict on liability, but rather a reversal and remand for a jury trial on the merits of this case in accordance with the state and federal constitutions.

[¶81.]    MEIERHENRY, Justice, joins this dissent.

Address **Pierre, S Dakota**

Get Google Maps on your phone
Text the word "GMAPS" to 466453



# PHOTO SHEET

Company: PEPL
Insured: Emplo St. / DoT
Claimant: TRUMAN/ROUNDS/GIAGO

Date of Claim: 2/13/2004
File No: 5C04. 30214
Adjuster: J. MATTHIESEN

Photo No. 13.
Date Taken 8/30/04
Description

Appr St. view of Ht 12 - Again Shows double yell. p overall view of Jct. Knoll on SE corner Jct. in full [...] [...] view of traffic for [...].

Photo No. 14
Date Taken 8/30/04
Description

Closer to Jct - Still facing North - close up Jct layout Accident occurred here when Giago attempted to go North onto 63 And crossed South lane.

CA-13

Sioux Falls SD 57101 (605)333-9810

228

**Photo descriptions typed for clarity**

## PHOTO SHEET

Company: *PEPL*
Insured: *EMPLO St / DiT*
Claimant: *TRUMAN / ROUNDS / GIAGO*

Date of Claim: *2/13/2004*
File No: *DC04 30214*
Adjuster: *J. MATTHIESEN*



**Photo No. 13**
**Date Taken: 8/30/04**
**Description:**
**Approximately same view as #12 - Again shows double yellow & overall view of junction. Knoll on SE corner of junction in field partially hinders view of traffic from east.**



**Photo No. 14**
**Date Taken 8/30/04**
**Description: Closer to junction - Still facing north. Close up of junction layout. Accident occurred here when Giago attempted to go north onto 63 and crossed south lane.**

SD 57101 (605)333-9810

CA-13

228

**Attachment 3**

**Figure 2A-2.**



ACUTE ANGLE INTERSECTION